Our next case is Nestle USA, Inc. v. Steuben Foods, Inc. This is a motion that was filed this morning in the Steuben County Council. This morning we had a motion filed, a motion to withdraw council for Applebee's Steuben Foods and we didn't have the time to post our decision, but the motion is granted. And, sir, you have reserved three minutes of your time for rebuttal, is that correct? I have. Okay, you may proceed. Thank you. May it please the court, the board erred in this IPR when it found that Nestle failed to prove unpatentability because the board, one, misconstrued the claim term aseptic, and two, conducted a flawed obviousness analysis. Aseptic means the absence of microorganisms. The board erred by expanding the meaning of aseptic to include the FDA's food additive regulations, which limit the amount of hydrogen peroxide in a packaged food product. Properly construed claims 18 and 19 do not include a residual hydrogen peroxide limitation, and because Steuben's arguments and the board's analysis were predicated on this construction, this board should reverse as to those claims. Well, it does say FDA standard applicable to the FDA standard, correct? It does say that. Well, your argument, aseptic should be the same as the claims of the prior art. You, and the claims themselves refer to, let's see, an FDA standard. Am I wrong with that? The claims do not refer to the FDA standard. I mean, the specification clearly says aseptic should be understood as the FDA standards. I don't know that we need to quibble about that because I don't think that necessarily forecloses your argument because as far as I can tell, there's nothing in FDA regulations that says this is an aseptic standard. There's a bunch of different standards that apply to food packaging and processing. Some of them may relate to whether something's aseptic. Some of them may be, as you, I think, are trying to say, a food additive standard that doesn't have anything to do with aseptic processing. But I think we have to start with the notion that the specification did specifically say, use the FDA standard for aseptic. The specification said aseptic means the FDA level of aseptic. Aseptic means absence of microorganisms. And our position is that when they say the FDA level of aseptic, they're talking about the FDA standard for the absence of microorganisms or for using a steroid. Right. Can I ask you, are those the same standards that are in Claim 18 and 19 about different levels of reduction of spore organisms and a 12-watt reduction in clostridium and flocculinum? Well, the UHT process, which is required to sterilize the food, requires a 12-watt reduction. So that's a standard in the industry and I think probably... Is that an aseptic standard? I mean, part of the problem here is we have a patent that says use FDA standards. Yes. But I don't see anything, any site has pointed to where the FDA said, here are the standards for aseptic. They just have a bunch of different standards. That's correct. And then they're forcing, you know, the board and us into trying to put which ones are an aseptic standard and which ones are other standards into a box. Correct. And the board's instruction was any applicable FDA standard. So it forces us to go through analysis of what is applicable, forces us to go through an analysis of what is a standard. Does that mean it's something that is actually written down as a regulation? Are there other standards that the FDA, you know, uses in the ordinary course of business? So it becomes a very ambiguous claim construction once you go down the route that the board has done, which is to say that FDA level of aseptic includes the 0.5 residual hydrogen peroxide regulation in the FDA regulations. Well, I get you. I mean, the problem here, and I know it's not for us, but if it's any FDA standard, how is the patent even definite? Because FDA could change standards that weren't even, you know, in existence at the time. That's correct. To capture every single change in what the FDA policy is seems wrong. And I will tell you that in the district court, this construction, which undoubtedly if it's firm, the district court is going to rely on, is going to create havoc because it's completely ambiguous as to what that term means. Well, I don't know if it will complete havoc. I think they might just find it invalid for indefiniteness. To your point, at one point in time, the hydrogen peroxide limitation, residual limitation, was 0.1 ppm, and subsequently it was changed to 0.5. So you are correct that once you start talking about FDA regulations or incorporating that into the definition or construction of aseptic, you're talking about something that changes over time. If we agree with you that the board has improperly imported this 0.5 hydrogen peroxide limitation into the definition of aseptic, what do we do with the case? Does it have to be remanded for them to apply the proper construction? I do not think it needs to be remanded because for a couple of reasons. All the evidence that was presented by the patent relied on the residual standard, the 0.5 residual standard, which was part of its so-called narrow path or the sweet spot that the board presented. So you think there's sufficient factual findings by the board for us to find this invalid even under our corrected claims instruction? I think that there's the undisputed disclosures in the prior art, including BOSH references, are sufficient for this court to conclude that these claims are obvious as a matter of the law because the claims are so broad. I guess my problem with that is the board also said there's a bunch of different BOSH references and couldn't find a motivation to combine. Now, it was doing it with regard, I think, to the 0.5 limitation, but it didn't seem to me that we could go out and say that, factually, there's a motivation to combine these for these other limitations even if we set aside the 0.5. Well, I think that given the undisputed disclosures in the BOSH references that the court can certainly make the combination, also given the fact that the claims are so broad. I mean, the claims have no limit on the size of the machines, the type of container. You can use a glass container, which can be heated to very high temperatures. The patent itself acknowledges that aseptic processing was already known. It acknowledges that in the first column of the patent. The record shows that there were 500 processes that had been approved by the FDA, aseptic processes, at the time the application was filed. That's undisputed. Most of them were not models, but people were doing aseptic processing. They knew how to kill the bugs. They knew how to get rid of the hydrogen peroxide. There's no dispute that the BOSH references disclosed a machine that was actually approved by the FDA, actually sold in the United States. So there are a lot of undisputed facts which the court can rely, we believe, to find that these claims are obvious. Can I ask you, I know this isn't before us, but am I correct, is there another proceeding at the board going on now about this patent where the board has invalidated these claims on different references? Yes. And so I know that's not final, but that's going to come up presumably to us at some point. So I guess what we do here is still not going to be final one way or another, because we're waiting on what happens in that case. Well, if you find that these claims are invalid, then it will be final. But there is another case pending. It's a re-examination that the board has issued a decision on that. I think there may be a petition for re-hearing or something still outstanding, but presumably that will also come up. I guess I'm just thinking if we agree with you about this incorrect claim construction, it isn't the better course for us just to remand it back to the board rather than reach out and make what to me seem uncomfortably like new fact findings, particularly since the board has already invalidated this. Well, I will point out that Claim 20 does in fact include a residual hydroperoxide limitation. Sure. So I think that that claim at a minimum should be vacated. That decision should be vacated on that claim because the board really, I think, committed a legally erroneous obviousness analysis, at least in several respects. As I said earlier, it really ignored the scope of these claims, which are incredibly broad. It didn't confront the fact that the claims can cover glass bottles, which is one of the type of bottles disclosed in the Bosch references, which allow you to heat the hydroperoxide to much higher temperatures, makes it more effective as a sterile, and makes it easier to get rid of. Also, the board essentially refused to combine the Bosch prior art references because they were not identical. I don't think there's any case, certainly that's completely inconsistent with KSR, the idea that somehow there has to be identity between the processes before you can start combining them to look at the parameters. There's no dispute that these references, they come from the same company. They describe essentially the same machine. Many of the same drawings in the references are identical. So it would be hard to imagine a stronger case for combining references than these Bosch references. You're almost out of time, and I want to get to a particular point. My concern in this case is the construction. The board wrote, the question before us is whether the asserted prior art as a whole was enabling such that a skilled artisan would have had a reasonable expectation of success. Did anybody argue this mixture of enablement with a reasonable expectation of success? Do you know where the board got that? Well, the student argued that the art is unpredictable, and one skilled artisan would not be able to combine the references with a reasonable expectation of success. So that was, I think their position was that there wasn't sufficient disclosure to enable one skilled new art to practice the invention. So that was, I think it came from the patent owner's position. But I think that the enablement analysis that the board went through I think was incorrect because, again, it was unwilling to combine the references, and it was unwilling to even compare the disclosure in the patent versus the disclosure that's in the references, suggesting that that was not a relevant comparison, whereas the case law in this court clearly says that you can look at the patent specification to get a sense as to how much disclosure is required in the prior art. Just to make sure, your argument is that the FDA level of septic, because the specification, I think I said claims earlier that the claims had that, but it's in the specification that the FDA level of septic does not include the 0.5 FDA standard. Correct, because it's not a septic standard. It's a standard that applies to any process that might use hydrogen peroxide. It's a food additive limitation in the claim. So if you were going to use hydrogen peroxide in a process that was not a septic, which are processes which are basically shelf-stable, you don't have to refrigerate them. But if you did it for another process that wasn't a septic, not quite as much sterilization, you would still have to meet the 0.5 standard. All right, let's hear from the other side now. Mr. Fisher? Yes. Yes, you may proceed. May it please the Court. The burden in this IPR was on Nestle to prove unpatentability of the challenged claims by proponents of the evidence. The burden never shifted to student, and for that matter to the Board, but remained on Nestle throughout the proceeding. This Court made that clear in the Magnum Oil decision last year. To carry its burden, Nestle was required to demonstrate both that a skilled artisan would have had reason to combine the references, and that in doing so, that a skilled artisan would have had a reasonable expectation of success. Nestle failed to do either. Let's take a look at the Board's construction of a septic. The Board said, a septic to any applicable U.S. FDA standard, and in the absence of any such standard, a septic assumed its ordinary meaning of free. So there's two words here that concern me, and that's applicable. I mean, we don't know which one. I mean, it's pretty wide open to any applicable. There's something that's determined in the future. Then it goes on and says, and in the absence. These appear to me to be two contingencies that create a flawed construction. This is a lexicography case, first and foremost. The patent specification expressly defines a septic twice, as meaning the U.S. FDA level of a septic. Those skilled in the art well understood what the U.S. FDA level of a septic was. It's explained in the specification. It's explained in the prior art. There is a requirement for commercial sterility on the packages and in the food. Mr. Jenkins talked about the UHD food. That's commercial sterility on the food. This is in 21 CFR 113. So there's a requirement for commercial sterility. There's also that same commercial sterility requirement applies to the packages. So those skilled in the art understood that if you're going to do an aseptic process, you have to achieve commercial sterility of the food that you're going to put into it and the package that you're going to put it into. There's another aseptic standard that says that you can achieve commercial sterility using chemical steriles. Hydrogen peroxide is a chemical sterile. There's another FDA standard that says if you're going to put hydrogen peroxide on a package, you must remove the hydrogen peroxide such that there's no more than 0.5 ppm residual on that package. Those skilled in the art well understood this. This was the difficult nut to crack in the United States. Aseptic was being done in Europe. They did not have the 0.5 ppm requirement. We put in our brief several examples of failures of companies that were already in the aseptic business in Europe. We tried to bring that technology to the United States and they failed. In one case, the Gall case, five year effort. The problem though is you can't point to anything where the FDA says this 0.5 standard is an aseptic standard. Hydrogen, I mean, I have again, I'm not sure the record demonstrates this, but I imagine hydrogen peroxide can be used in other forms of food processing that's not aseptic processing. This standard, I take it, still applies. You can't have more than 0.5 hydrogen peroxide in any kind of food, whether you use it as like a vegetable wash or an aseptic. So why is that an aseptic standard versus some other kind of standard? Because for those skilled in the art, again, we have to construe the claims through the lens of one skilled in the art. Those skilled in the art understood that to achieve aseptic in terms of the package, you're going to have to use a chemical steroid. Certain chemical steroids can be used. If you're going to use a steroid that includes hydrogen peroxide, that invokes the 0.5 TPM residual requirement. That's an FDA requirement. So why is it an aseptic requirement as opposed to a related requirement? It may be, I can't imagine that there's not, that when you use glass bottles with plastic caps, that there's probably all kinds of different standards to say what kind of glass you can use, what kind of plastic you can use. Are those aseptic standards too? I'm not familiar with those regulations, but no, it's the context of aseptic. And again, the FDA's regulations provide a framework. If you're going to do aseptic packaging, you have to achieve commercial sterility on the package. You have to achieve commercial sterility on the food. You have to use a chemical steroid to get commercial sterility. If you're going to use a commercial steroid that includes hydrogen peroxide, you have to achieve the 0.5 TPM. This is throughout all of the aseptic packaging. What if that regulation changes in the future? I'm sorry? What if that changes and becomes a 0.2 or a 0.7? I think the question then becomes, was it a foreseeable change? It's a standard. Let me ask you this another way. Why would we read the 0.5 limitation into all these claims when you have specifically put the 0.5 limitation in claim 20? I mean, isn't that contrary to our normal principles of claim differentiation? Let me take the first part first. I don't think that 0.5 TPM is part of the claim construction. I think that the claim construction is lexicography. In this patent, aseptic... I don't understand that at all. You're saying that the definition of aseptic does not include a 0.5 reduction? Not necessarily. The lexicographic... Well, that's the construction the board used. The board found that if we're under the alexicography, U.S. FDA level of aseptic. So that's the definition of aseptic. There is a claim term that requires aseptically disinfecting. What does that mean? That means that you need to meet the applicable FDA standards to aseptically disinfect that bottle package. That means you have to get enough sterilant on it to achieve commercial sterility. And if you're using hydroxide, you've got to get it off to meet the 0.5 PPM. That's the applicable FDA standard for aseptically disinfecting. So it was an application of the claim construction FDA standards to determine the scope of the prior arc to determine if that limitation had been met. That just baffles me what you just said. Does the claim construction of aseptic include the 0.5 or not? The construction based on alexicography is FDA level of aseptic. Which either includes the 0.5 or it doesn't. That's right. And the board found it does. The board found it does, right? The board looked at the challenge. Because they found that there was no reasonable expectation that a person of ordinary skill would combine this prior arc to achieve the 0.5. No, with respect to the 0.5, the board found that... Look, I mean, you're not going to get out of here with an answer to whether the claim construction includes a 0.5 or not. How could we ever assess whether the board was proper in applying a claim construction when we don't even know what you think the claim construction was? I think the claim construction was the alexicography that the applicable FDA standards apply. Which is a 0.5 hydrogen peroxide. The point I want to get out is that first you construe the claims and then you determine if the claims are met by the challenge. The board looked at the challenge. All of the references asserted in the challenge were low acid aseptic packaging using a hydrogen peroxide sterile. So, the board took the claim construction FDA standards and said for that challenge, those hydrogen peroxide sterile references, for those references to teach this claim, those references have to meet 0.5. Otherwise, they're not meeting the FDA standard. So, it was a finding of fact in determining whether that challenge met the lexicographic definition of FDA standard. I'm not sure about the argument that we have a lexicographer situation. We may, but it seems to me that if there was an attempt to define aseptic to include FDA level, and if the attempt was to identify a specific level, then the attempt failed. There's nothing clear or reasonable or anything that lends clarity by the definition of FDA level of aseptic. I mean, that doesn't mean much. Other than perhaps some standard, some FDA standard, at least one FDA standard has to be met. They all have to be met. And to be clear, it's a framework. It's commercial sterility, killing the bad stuff on the bottles, and it's the residual standard if you're using hydrogen peroxide. So, you've got to thread that needle. Those skilled in the art, the record is unanimous. Those skilled in the art understand that the FDA requires commercial sterility. The record is unanimous. All the evidence shows that those skilled in the art, including Dr. Heldman, understand that the .5 ppm residual requirement is an FDA standard. With that backdrop, and Mr. Taggart defining his invention, hey, this stuff's been done, but nobody can thread the needle with the .5 ppm and the commercial sterility. Here's how you do it, and it's highly complex. You've got to get enough sterling on. You've got to get it on in a way that you don't have big droplets. If you have big droplets, you're not going to be able to get it off. You have to have the right dwell times. You have to have the right air flows. You have to do it all in a sterile tunnel. You have to remove it, and you have to remove it sufficiently. And almost everything you just said is not in the claims. This is the FDA standard that has to be met. It's a complex invention. Mr. Taggart was the first to achieve a high-speed, low-acid, aseptic. But he didn't claim any of those things you just said. He claimed it through the aseptically disinfecting to meet the FDA standards. It was those FDA standards that was driving everything. But you just listed about half a dozen different things that have to be performed to meet this standard, but didn't put a single one of those in the claims. So how are those elements of the claims? It sounds to me like no invention whatsoever to just say there's this FDA standard out here. Let's do it in a high-speed way, and let's meet it. He shows how to do it. The prior art couldn't do it. He didn't put it in his claims. He put it in his claims through lexicography. We're going to meet the FDA level of aseptic. So Claim 20 incorporates the specific FDA regulations of 0.5 residual peroxide that we're talking about. If you read that standard into that claim, then the claim is rendered superfluous. No, because the Claim 18 would not require hydrogen peroxide. I'm not Claim 18. I'm talking about Claim 20. If you read... If you read a limitation, a 0.5 limitation into that claim, then it already has that limitation in it. Again, I don't think it's proper to expressly read 0.5 in because the lexicography is FDA standards. But you say any, that they're all applicable. The FDA standards are applicable. Including the 0.5? Yes. In the context where it's challenged. Well, that's my question. If you read that standard into Claim 20, then it renders that claim superfluous. That's contrary to construction rules, isn't it? I don't think that that's... I think it's a common way to narrow the claim. You claim broadly and the concept of aseptically disinfecting includes 0.5 in some instances, and you can claim that as a fact that you've specifically called out. into a claim that already states that. The claim states, reading it based just on the lexicography, this claim would state that it was to the FDA level of aseptic using hydrogen peroxide and 0.5 ppm, whereas Claim 18 would say to the FDA level of aseptic but not be limited to hydrogen peroxide and 0.5 ppm. So it's a different way of claiming, and I think a differentiation is a rule of thumb. It's not a hard and fast rule. I think that that's consistent. I'd like to mention... My time is running short here. With respect to the other proceedings, there are now five PFAB panels who have agreed that the proper construction of aseptic is driven by the lexicography in the FDA level of aseptic. All of the final decisions for five different PFAB panels. In Nestle's brief, they refer to the claim construction and re-exam proceeding, but prior to Nestle's five brief, that re-exam panel withdrew that decision and expressly adopted the claim construction set forth in this proceeding. So we've all now adopted the lexicographic definition that aseptic means FDA level of aseptic. With respect to Your Honor's question on enablement, that's not before this court. Again, I think that... It's not before the court, but the board does use that term. And I thought that was rather odd, that this statement that the board read was confused. It's mixed up, and it's odd. And that did not come from Pat Norman. I think that came from Petitioner, where they argued that the references, the BOSH references, were enabled more so than the L1-3 patent. That's contradicted by the evidence. Dr. Booley went into great detail on the L1-3 and explained that the one skeleton yard could get the solution from the L1-3 patent, could not even begin the process from the BOSH references. I think the board was using enable to... And not looking at an enablement... It specifically rejected Nestle's argument that enablement matters. It said specifically and expressly that there is no one or two issues here. Enablement is one of the two issues. All right, thank you. Two minutes. Mr. King, you have two minutes of your time. Thank you. I'd like to go back to the question about if the court decides that the claim construction that the board adopted was an error, should the case be remanded, or should the court go ahead and decide the obviousness issue here? I think that the case is right for a decision of obviousness here. Not unlike the summary judgment decision that the Supreme Court basically made in the KSR case based on the teachings and the references. I'm just confused as to how we can do that with Claim 20, which does include this limitation. I mean, even if we agree with you that aseptic... The definition of aseptic itself doesn't include the 0.5 hydrogen peroxide. Claim 20 specifically does it, and that's the finding that the board made that these references put together, you wouldn't combine them to come up with all these elements. And I know you want us to look at it again and say, well, of course you would combine them. And maybe I agree with you as a matter of fact, but I can't do that. I mean, that's a factual finding that we can't reverse unless there's a complete lack of substantial evidence. So it seems like the Claim 20, at the very least, has to go back. Well, I would say that the petition established a prima facie case of obviousness. That was confirmed by the institution. I get what you're saying. It seems to me that the board messed this up, but it's a question of what our standard of review here is. And the board made a finding that you would not combine these different BOSH references to come up with all these elements, including the 0.5 limitation. And I don't find that so unreasonable that it lacks in substantial evidence. I don't get to do it on appeal for the first time. So at least with regard to Claim 20, I don't know how we get around that lack of combination finding. Well, because at a minimum, it needs to be remanded because of the legal error that the board made in its obviousness analysis. Okay. That's all. Thank you. All right, thank you.